IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division

2017 SEP 22 P 12: 34

MS. CHARLES CANTER                          *

    Plaintiff,                                  *

v                                           *      Case No.: GJH-16-2545

SGT. SCHOPPERT, *et al.*                    *

    Defendants.                                 *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Currently pending before the Court is Sgt. Richard Schoppert, CO II Brian Barrett, Warden Frank Bishop, Assistant Warden Jeff Nines, Chief William Bohrer, Charlotte Zies, CO II Jared Zais, and Capt. Gregory Werner's (collectively, "Defendants"),[1] Motion to Dismiss or for Summary Judgment, ECF No. 33, in response to Plaintiff Charles Canter's civil rights Complaint. A hearing on this motion is unnecessary. Local Rule 105.6 (D. Md. 2016). For the reasons that follow, Defendants' motion, construed as a Motion for Summary Judgment, shall be denied in part and granted in part.

I.   **Background**[2]

    A.   **Factual Background**

Plaintiff Charles Canter is an inmate committed to the custody of the Department of Public Safety and Correctional Services (DPSCS) and at all times relevant to the Complaint was

---

[1] The Clerk is directed to correct the docket to reflect the full and correct spelling of Defendants' names and Plaintiff's Motion to Correct the Spelling, ECF No. 26, shall be granted.
[2] The facts relied on herein are either undisputed or viewed in the light most favorable to the Plaintiff.

1

confined to North Branch Correctional Institution (NBCI). ECF No. 19 at 2.[3] Canter, who identifies as a transgender female,[4] claims that, on June 18, 2016, she was confined to Housing Unit One, C-tier. ECF No. 1 at 4. When Canter's breakfast tray was delivered to her cell, she realized it was not the meal she was supposed to receive pursuant to her medical diet of 2,400 calories per day. Canter asked Officers Crowe and Hill to call Dietary Officer Pratt regarding the mistake. *Id.* at 5.

Hill complied with Canter's request and informed Canter that Pratt was coming to Canter's cell to address the issue with the breakfast tray. Upon being so informed, Canter placed her breakfast tray "long ways" in the feed up slot of the cell door to prevent the slot from being closed. *Id.* Crowe came to Canter's cell and ordered her to take the tray out of the slot so that he could close the feed-up slot. Canter refused and explained she wanted to speak with the sergeant on duty. Crowe told Canter that the sergeant "ain't gonna come down" and Canter again refused to allow the slot to be closed. *Id.*

Officer Barrett then came to Canter's cell and ordered her to close the feed-up slot. *Id.* at 6. Canter refused and Barrett allegedly responded, "fuck you no one's gonna come and see you." Barrett then walked away from the cell toward the "cage" that divides C-tier from B-tier and grabbed a security shield, which he attempted to pull through the doorway of the cage. *Id.* Barrett was unable to get the security shield through the doorway so he walked in a different direction and obtained a smaller security shield, which he placed on the outside of Canter's cell door. *Id.*

Barrett latched the shield on the right side of Canter's door, but could not latch the left side of the shield because the sliding door for the feed-up slot was opened too far. According to

---

[3] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.
[4] Because Canter identifies as a transgender female, the pronouns used in this Memorandum Opinion that reference Canter will be female pronouns.

2

Canter, Barrett became angry and frustrated and began kicking the shield. Barrett again told Canter to move her hand and the tray, but Canter refused. Barrett then moved the shield and kicked the sliding door three to five times, "sharp[ly]," with extreme force. *Id.* at 8. As a result of Barrett's actions, the hard rubber food tray bent and Canter's forearm, hand, and wrist were caught between the feed-up slot door and the door frame. Canter could not remove her hand from the slot and states that the tray was "warped around my arm," cutting off the blood circulation to her hand. *Id.*

Canter cursed at Barrett for trapping her arm in the door and demanded to see a Lieutenant so that she could file a claim for use of excessive force against Barrett. *Id.* at 7.[5] Canter claims that Barrett responded that Canter should not have had her hand in the slot, smiled, and walked away. Canter claims that her arm was left caught in the slot for about twenty minutes before Hill returned to deliver a brown-bag lunch to another inmate, Derrick Dirton. *Id.*

When Hill reached Dirton's cell, Dirton informed Hill that Barrett smashed Canter's hand in the feed-up slot and stated that Canter needed medical attention. *Id.* Hill came to Canter's door, saw her hand smashed in the slot, and attempted to open the slider so that Canter could remove her hand. Hill could not open the sliding feed-up door because Barrett had damaged it when he kicked the door. Hill told Canter he would go get the Sergeant and walked away. *Id.*

Thirty minutes after Hill left, Defendants Schoppert and Barrett arrived at Canter's door. *Id.* at 7, 9. They observed Canter's arm smashed with the tray and saw that Canter's hand was turning purple. Canter claims that Schoppert defended Barrett and said that Barrett would not violate policies and procedures as Canter had claimed. *Id.* at 9. Barrett also denied kicking the slot closed onto Canter's arm. Schoppert asked Canter what injuries she sustained and Canter showed him her left arm which was bruised and had an impression of the food tray on it. Canter

---

[5] Pages 7 and 8 of the complaint are reversed on the electronic docket.

then requested that she be given medical attention, allowed to write a statement regarding the incident, and allowed to speak with a supervisor. *Id.*

Canter claims that Schoppert denied all of her requests and, in response, the entire tier held their feed-up slots open so that Canter would be provided medical attention. In addition, Canter covered her cell window in protest. *Id.* at 9.

Canter was examined by a registered nurse who determined that Canter's left arm, wrist, hand, forearm, and fingers were bruised both internally and externally. The nurse provided Canter with an Ace bandage and instructed Canter to use it for seven days and to put in a sick call slip to be seen again if the injuries did not improve. *Id.* at 10. Canter was subsequently informed by Warner that the matter had been referred to the Internal Investigation Division (IID) for the purpose of determining whether criminal charges would be filed. *Id.* at 11–12.

On June 22, 2016, Canter alleges that Officer Zies came to her cell door to discuss an administrative remedy procedure complaint (ARP) and asked "what we can do about this," referring to the ARP. Canter told Zies there was nothing that could be done because she wanted "both Defendants charged with assault and neglect." Zies responded he would process the ARP and the complaint was dismissed the same day because the matter had been referred to IID. *Id.* at 12.

On June 25, 2016, Canter claims that she was interviewed by IID Detective Sergeant Chris Burton. Canter states she provided two affidavits to Burton from inmate witnesses who observed the incident and told Burton he should speak with them, but that Burton never did so. *Id.* at 12–13. Canter also provided Burton with a copy of the ARP, sick call slips, and request slips and asked Burton to review the surveillance video from the tier cameras. Burton assured Canter that the video footage would be provided to him on CD Rom for his review. *Id.* Canter

4

then asked Burton to conduct polygraph tests on Barrett, Schoppert, and Canter herself. *Id.* at 13. Burton told Canter that polygraph tests were unnecessary "because the evidence supported [Canter's] sequence of events." Burton then asked Canter to state for the record whether she wanted to pursue criminal charges. *Id.* Canter claims that Burton saw her injuries and assured her that the case would be presented to the State's Attorney for Allegany County who would decide if criminal charges would be pursued. Canter informed Burton that she was in fear for her life and safety. Burton concluded the interview and Canter was taken back to her cell. *Id.*

Defendants provide a copy of IID's investigative report, which summarizes Detective Chris Burton's investigation, and states that the video surveillance was viewed by the detective investigating the claim. ECF No. 33. The report claims that the video confirms that Barrett kicked the door closed, but it could neither be confirmed nor denied that Canter's arm was in the slot at the time the door was kicked. ECF No. 33-3 at 9. Burton interviewed several individuals throughout his investigation. Barrett denied that Canter's arm was in the slot at the time he closed it; rather, he claimed that Canter was at the back of her cell near the window attempting to incite other inmates to protest. *Id.* Burton also interviewed Officers Crowe and Hill. *Id.* at 8. Crowe stated that he never saw Canter's arm stuck in the slot. *Id.* Burton noted that the injury Canter received to her arm was a bruise, but that medical staff could not determine the age of the bruise. *Id.* at 9, 11–13 (medical report), 16 (photograph of Canter's bruised wrist). Burton determined that the injury sustained was inconsistent with Canter's account of Barrett kicking the door closed on her arm. *Id.* at 9. Based on this conclusion, Burton recommended the case be closed without filing criminal charges against Barrett. *Id.*

After her injury, Canter alleges that retaliatory actions have been taken against her for the filing of the instant complaint and names Warden Frank Bishop, Assistant Warden Jeff Nines,

Security Chief William Borher, Case Manager C. Zies, Officer Jared Zias, and Intelligence Officer Werner as defendants. ECF No. 19. Canter claims that Defendants have used intimidation, including the use of a jailhouse informant, to convince her to drop the instant lawsuit, which was filed on July 12, 2016. Specifically, Canter's complaint was dismissed upon receipt of a voluntary dismissal received in this case which Canter asserts she never filed. *See* ECF No. 6. Canter claims that another inmate, at the behest of Defendants Zies and Barrett, sent the voluntary dismissal to the Court. ECF No. 19 at 5. Upon receipt of that information, ECF No. 12, this Court reopened the case.[6] ECF No. 14. After an investigation into the matter, officials at NBCI determined that the pleading was written and filed by inmate Walter Hall. ECF No. 18.

Defendants argue that Canter's Complaint fails to state claims, and that the defendants are entitled to qualified immunity. ECF No. 33-1. They further allege that Canter was not placed on administrative segregation as form of retaliation, but because she had enemies in the general population of NBCI from whom she needed to be separated. ECF No. 33-1 at 18. They assert that administrative segregation is not a form of punishment as inmates so assigned still enjoy many privileges similar to those in general population. *Id.*

B.     **Procedural Background**

On July 12, 2016, Canter filed the instant Complaint with the Court, naming Burton, Schoppert and Barrett as defendants. ECF No. 1. On November 9, 2016, Canter filed an "Amendment Complaint," ECF No. 19, in which she additionally named Bishop, Nines, Bohrer, Zies, Werner and Zais as defendants. Canter claims that Barrett used excessive force when he kicked the slot door closed on her left arm in violation of Canter's rights under the Eighth Amendment. She further claims that Schoppert violated her Eighth Amendment rights when he

---
[6] The Court notes that Canter's case was not the only one in which an apparently fraudulent voluntary dismissal was filed.

6

covered up the incident, refused to notify a supervisor, and denied Canter medical attention for her injury. *Id.* at 15–16.

Canter further claims that this Court is permitting Defendants to obstruct justice because they have not been forced to turn over video surveillance of the prison tier where the initial assault took place. ECF 19 at 6. Canter claims that Defendants have refused to turn over the video surveillance to the IID for purposes of criminal charges being filed against Barrett and have refused to comply with the Order of this Court to turn over the surveillance footage. Canter claims that Barrett has threatened to beat her to death or spray her with mace if she does not drop the matter regarding criminal charges and the instant case. *Id.* at 9. When Canter told Case Manager C. Zies about the threats, Zies told her that there was nothing that could be done to protect Canter unless Barrett assaults her and it is captured on video. *Id.* at 8–9.

As relief, Canter seeks declaratory and injunctive relief as well as monetary damages. Canter additionally asks this Court to watch the surveillance video from the tier camera and to refer the matter to the United States Attorney's Office for investigation. *Id.* at 18.

On December 2, 2016, Canter filed a Motion to Force Defendants to Turn Over Video Security Footage. ECF No. 15. Defendants oppose Canter's request that the video be presented to the Court as evidence, arguing that discovery has not yet started and that, in any event, the video does not support Canter's claim. The motion shall be construed as one filed pursuant to Fed. R. of Civ. Proc. 56(d), and is addressed below. On January 30, 2017, Canter also filed a Motion to Block Extension of Time Requests Made by Defendants, ECF No. 32, which shall be denied as the extensions of time requested were for good cause. Finally, on February 14, 2017, Defendants filed a Motion to Dismiss for Failure to State a Claim or, in the alternative, Motion for Summary Judgment. ECF No. 33.

7

## II. Standard of Review

The Court is mindful that Canter is proceeding *pro se* and therefore the Court must liberally construe her pleadings. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972) (per curiam); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). "[T]he mandated liberal construction afforded to pro se pleadings 'means that if the court can reasonably read the pleadings to state a valid claim on which the petitioner could prevail, it should do so.'" *Barnett v. Hargett*, 174 F.3d 1128, 1133 (10th Cir. 1999). However, "judges are . . . not required to construct a party's legal arguments for him." *Small v. Endicott*, 998 F.2d 411, 417-18 (7th Cir. 1993).

Here, Defendants have filed a "Motion to Dismiss or, in the alternative, Motion for Summary Judgment." ECF No. 13. The Court addresses each legal standard in turn.

### A. Rule 12(b)(6) Motion to Dismiss

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555 ("a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do.")).

The purpose of Fed. R. Civ. P. 12(b)(6) "is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (citation and internal

8

quotation marks omitted). When deciding a motion to dismiss under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations and internal quotation marks omitted). The Court need not, however, accept unsupported legal allegations, *see Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events. *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

**B.     Motion for Summary Judgment**

When ruling on a motion to dismiss, if the Court considers materials outside the pleadings, the Court must treat a motion to dismiss as one for summary judgment. Fed. R. Civ. P. 12(d). When the Court treats a motion to dismiss as a motion for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* When the moving party styles its motion as a "Motion to Dismiss, or in the Alternative, for Summary Judgment," as is the case here, and attaches additional materials to its motion, the nonmoving party is, of course, aware that materials outside the pleadings are before the Court, and the Court can treat the motion as one for summary judgment. *See Laughlin v. Metropolitan Wash. Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998). Further, the Court is not prohibited from granting a motion for summary judgment before the commencement of discovery. *See* Fed. R. Civ. P. 56(a) (stating that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact" without distinguishing pre- or post-discovery).

Summary judgment is appropriate if "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c), show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the burden of demonstrating that no genuine dispute exists as to material facts. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). If the moving party demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify specific facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 322–23. A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248. However, the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1986). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

### III. Discussion

#### A. Liability of Defendants Bishop, Nines, Bohrer, Zais and Werner

It is well established that the doctrine of *respondeat superior* does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (finding no *respondeat*

*superior* liability under § 1983). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Supervisory liability under §1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

Canter has not sufficiently pleaded claims against Bishop, Nines, Bohrer, Zais and Werner (the "Supervisor Defendants"), and the Court will grant the Supervisor Defendants' Motion to Dismiss on these claims. The claims against the Supervisor Defendants are based on their responsibilities as supervisors with respect to the investigation into Canter's claim of excessive force. ECF No. 35 at 31–32. However, Canter does not plead that any of the Supervisor Defendants' response to her allegations was so inadequate as to show deliberate indifference or tacit authorization. Canter states that the Supervisor Defendants knew about all of the allegations she is raising in this case but failed to take unspecified corrective action. *Id.* However, Canter concedes that an IID investigation had been ordered in Canter's case and that the conclusion of that investigation was to close the matter without pursuit of criminal charges against Barrett. The Court finds that it was entirely reasonable for the Supervisor Defendants to

allow Canter's allegations to be handled through the IID investigation, and to defer to that investigation's results. As such, the Court dismisses the claims against the Supervisor Defendants.

### B. Rule 56(d) Motion

Federal Rule of Civil Procedure 56(d) provides that:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts to justify its opposition, the court may:
>
> (1) Defer considering the motion or deny it;
> (2) Allow time to obtain affidavits or declarations or to take discovery; or
> (3) Issue any other appropriate order.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244–45 (discussing affidavit requirement of former Rule 56(f))

Notably, "'Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery.'" *Hamilton v. Mayor & City Council of Baltimore*, 807 F.Supp. 2d 331, 342 (D. Md. 2011) (quoting *Young v. UPS*, No. DKC-08-2586, 2011 WL 665321, at *20 (D. Md. Feb. 14, 2011)). "Rather, to justify a denial of summary judgment on the grounds that additional

discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F.Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F.Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F.App'x. 274 (4th Cir. 2008).

Review of the pleadings filed indicates that the surveillance video of the alleged assault is pivotal in the determination of the issues pending before this Court. Defendants' characterization of the content of the video is inconsistent with Burton's observation that it was inconclusive. The issue of whether Canter's arm was in the feed up slot when Barrett kicked the door closed is material and the dispute regarding this fact is genuine. Canter's Motion to Force Defendants to Turn Over Video Security Footage as Ordered by Court, ECF No. 15, which this Court construes as a request for discovery under Rule 56, shall be granted, and the Court will not grant summary judgment on Canter's Eighth Amendment Claims at this time. The Court will still consider Defendants' Motion to Dismiss the Eighth Amendment Claims.

### C. Eighth Amendment Claims against Schoppert and Barrett

The Court interprets Canter's Complaint as alleging an excessive force claim against Barrett, and a deliberate indifference to a medical need claim against Schoppert and Barrett.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). Whether force used by prison

13

officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U. S. 1, 6–7 (1992). Courts look at the need for application of force, the relationship between that need and the amount of force applied, the extent of the injury inflicted, the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials and any efforts made to temper the severity of the response. *Whitley v. Albers*, 475 U.S. 312, 321 (1986). The absence of significant injury alone is not dispositive of a claim of excessive force. *Wilkins v. Gaddy*, 559 U.S. 34 (2010). The extent of injury incurred is one factor indicative of whether or not the force used was necessary in a particular situation, but if force is applied maliciously and sadistically, liability is not avoided simply because the prisoner had the good fortune to escape serious harm. *Id.* at 38.

Canter's claim against Barrett states a claim of an Eighth Amendment violation, as the complaint alleges that Barrett committed a malicious act performed to deliberately cause Canter harm.

Canter also claims that upon observing Canter's arm caught in the security slot and observing an injury to Canter's arm, Schoppert and Barrett denied Canter's request for medical assistance and allowed the injury to worsen by leaving her caught in the security slot. Schoppert's and Barrett's alleged actions, viewed in the light most favorable to Canter, exhibit a callous disregard for Canter's pain and suffering. As such, Canter has stated a claim against Schoppert as well. Canter's Eighth Amendment claims against Schoppert and Barrett therefore survive Defendants' Motion to Dismiss, and Canter may seek additional discovery as appropriate.

D.  **First Amendment Claims**

1.  **Retaliation Claim against Barrett and Zies**

Canter alleges that Defendants Zies and Barrett used intimidation, including the use of a jailhouse informant, to convince her to drop the instant lawsuit. ECF No. 19. Canter further claims that her assignment to administrative segregation following her completion of disciplinary segregation time was for the purpose of forcing her to withdraw the instant complaint and not, as Defendants assert, to protect her from general population inmates. ECF No. 35.

In order to prevail on a claim of retaliation, Canter "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). It is unclear how much of a showing of adversity must be made in order to survive a motion for summary judgment. *See Burton v. Livingston*, 791 F.2d 97, 100–01 (8th Cir. 1986) (finding a "complaint that a prison guard, without provocation, and for the apparent purpose of retaliating against the prisoner's exercise of his rights in petitioning a federal court for redress, terrorized him with threats of death" sufficient to state claim). "A complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleading alone." *Gill v. Mooney*, 824 F.2d 192, 194 (2nd Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)); *Pierce v. King*, 918 F. Supp. 932, 945 (E.D. N.C. 1996), *judgment vacated on other grounds*, 525 U.S. 802 (1998) (conclusory allegations of retaliation insufficient to state claim).

> Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Where there is no impairment of the plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation. Thus, a showing of adversity is essential to any retaliation claim.

*ACLU of Md., Inc. v. Wicomico Cty, Md.*, 999 F.2d 780, 785 (4th Cir. 1993).

"In the prison context, we treat such claims with skepticism because '[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (quoting *Adams v. Rice*, 40 F.3d 72,74 (4th Cir. 1994)).

The protected activity at issue here is Canter's pursuit of a § 1983 claim in this Court. Defendants incorrectly state that there are "no specific examples of any threats" against Canter. ECF No. 33-1 at 16. Canter alleges in her Amended Complaint that Barrett threatened to "beat me to death or spray me down with [mace]" if she did not drop her § 1983 suit. ECF No. 19 at 9. Canter further alleges that Barrett and Zies conspired together and used another inmate to fraudulently write a letter to the Court to try to close Canter's § 1983 case. *Id.* at 5. Defendants have not offered any sworn statements from these Defendants denying this conduct. The Court finds that on these facts, Canter has stated a claim of retaliation to survive Defendants' Motion to Dismiss.

### 2. Access to Courts Claim

Canter's claim that Defendants violated her right of access to courts is that her inability to review the surveillance video has resulted in unspecified state court cases being dismissed. ECF No. 35 at 23. Canter appears to rely on the fact that criminal charges were not brought against Barrett for the alleged assault against her as a denial of her right of access to courts. *Id.* In addition, she claims that the failure to properly process her administrative remedy complaints impacted her ability to pursue legal claims. *Id.* at 30–31.

Prisoners have a constitutionally protected right of access to the courts. *See Bounds v. Smith*, 430 U. S. 817, 821 (1977). However,

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions

16

to slip-and-fall claims. The tools it requires to be provided are those that the
inmates need in order to attack their sentences, directly or collaterally, and in
order to challenge the conditions of their confinement. Impairment of any other
litigating capacity is simply one of the incidental (and perfectly constitutional)
consequences of conviction and incarceration.

*Lewis v. Casey*, 518 U. S. 343, 355 (1996).

"Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'" *O'Dell v. Netherland*, 112 F. 3d 773, 776 (4th Cir. 1997) (quoting *Lewis*, 518 U.S. at 355). "The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." *Lewis*, 518 U.S. at 349. Actual injury occurs when a prisoner demonstrates that a "nonfrivolous" and "arguable" claim was lost because of the denial of access to the courts. *Id.* at 399.

Canter does not have a right to insist on the criminal prosecution of another. To the extent that the instant case was temporarily closed due to the filing of a fraudulent pleading, Canter suffered no actual injury to her ability to pursue the claims asserted because the error was corrected. The claim with regard to processing of administrative remedy complaints also does not state an actual injury, as Canter does not explain how this has hindered her ability to pursue a legal claim. Absent an actual injury, Canter's claim that she has been denied access to courts fails and the Court dismisses this claim.

### IV. <u>Conclusion</u>

By separate Order which follows, Defendants' Motion to Dismiss or for Summary Judgment, ECF No. 33, construed in part as a Motion for Summary Judgment, shall be denied in

part and granted in part. Canter's Motion to Force Defendants to Turn Over Video Security Footage, ECF No. 15, construed as a motion filed pursuant to Fed. R. of Civ. Proc. 56(d) shall be granted. Her Motion to Correct Missed[sic] Spelled Names, ECF No. 26, shall also be granted, and her Motion to Block Extension of Time Requests, ECF No. 32, shall be denied. Canter's Motion to Appoint Counsel, ECF No. 13, which was previously denied without prejudice, shall be granted and this Court's Order denying the motion shall be vacated.

Dated: September 22, 2017

GEORGE J. HAZEL
United States District Judge